Nichols, Judge,
dissenting:
As Judge Davis points out, a regulation of long standing, Treas. Reg. § 1.871-2(b) purports to define when an alien present in the United States is a “resident” under our income tax laws, and Reg. § 1.911-2 (a) (2) incorporates it “to the extent feasible” by reference in the determination of what American citizens are bona fide foreign residents under § 911.
*47 Under Eeg. § 1.871-2 (b) one who comes to the United States for a definite purpose, which “may be promptly accomplished”, is a “transient”, but if “an extended stay” is necessary to accomplish his purpose he may become a resident even if he always intends to return home when his purpose is achieved. The meaning of this, as applicable here, depends on how one reads “promptly” and “extended” and these words do not, of themselves, answer our problem without ambiguity. But the regulation continues :
An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section in the absence of special circumstances.
I read this as referring to the various classes of nonimmi-grants enumerated in 8 U.SjC. § 1101(a) (15), among whom are alien officers or employees of international organizations and members of their immediate families, by subsec. (G) (IV). When such a person’s accreditation ends, the legality of his stay in the United States ends also. Menon v. Esperdy, 248 F. Supp 261 (1965), affd. 413 F. 2d 644 (2d Cir., 1969). By § 1184 nonimmigrants are admitted for such times as the Attorney General may by regulation prescribe. Without analyzing the situation in further detail I doubt if under the quoted line of Eeg. § 1.871-2 (b) an alien employee of an international organization, during his accreditation, would be a “resident” here in the eyes of our income tax laws. (Of course his pay is exempt anyway under IEC of 1954 § 893). Also I doubt whether a United States citizen is properly treated as a resident of a foreign country for purposes of our income tax laws, when a foreign citizen sojourning in this country, is not treated as one of its residents, under like or similar circumstances. The clear intention is to treat the cases alike, and any failure to do so is an anomaly that requires an explanation which is not forthcoming here. What are the “special circumstances” that remove this case from the general rule, or why is it not “feasible” to apply it ?
It is also significant, I think, that under § 1.871-4 (b) it is presumed that an alien in the United States is a nonresident. *48 It should likewise be presumed that a United States citizen sojourning in a foreign country is a nonresident of that country. § 911, applicable here, requires taxpayers claiming exemption under it to prove bona fide residence abroad “to the satisfaction of the Secretary.” It seems to me these provisions, taken together, add up to a more than normal burden on taxpayers to show the deficiencies assessed to be illegal because of their bona fide residence in Argentina. I do not think they have sustained the burden here.
I would dismiss both petitions.
Findings on Fact
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follow:
1. These cases were consolidated by order of the trial commissioner, entered May 2, 1966, and both are actions for recovery of federal income taxes and interest assessed against and collected from plaintiffs by the Internal Revenue Service, the taxable years being 1961 and 1962 in the Scott case, and 1963 in the Warnick case.
2. Each plaintiff,[1] a native citizen of the United States, is and was a university professor who entered into a contract of employment with the Food and Agriculture Organization (FAO) of the United Nations, and performed the contract services in Argentina in accordance with the agreement.
3. Dr. Frank S. Scott, Jr., resident of Kailua, Hawaii, was appointed and served as an associate professor in the Department of Agricultural Economics, University of Hawaii, commencing hi December 1954, and was promoted to full professor in 1959. In 1960, he was acting chairman of the department, and became its chairman in 1963, following his sabbatical leave for performance of his FAO contract.
Dr. Alvin C. Warnick, resident of Gainesville, Florida, was appointed and served as an assistant professor and assistant animal physiologist, commencing in October 1953, *49 and was promoted on July 1, 1962, to full professor and animal physiologist, Agricultural Experiment Station, Department of Animal Science, University of Florida, to which position he returned in January 1964, following his leave of absence for performance of his FAO contract.
4. At the time of entering into his FAO contract, and thereafter throughout its performance, each plaintiff intended to return to his position at his university.
5. Dr. Scott entered into his contract with FAO on December 2,1960, to perform services for 1 year, extended as hereinafter related, as a marketing adviser (agricultural economist) in Argentina. He departed from Hawaii by airplane the next day, spent 1 night in Mexico City, 2 or 3 days in Santiago, Chile, in consultation with an FAO official concerning his Argentine assignment, and arrived in Buenos Aires, Argentina, on December 7, 1960. He remained constantly in Argentina in the performance of his FAO duties until January 4, 1962, when he departed for the United States, stopping briefly at Santiago, Chile, for a conference with the official of the United Nations, and arrived in Los Angeles on January 6, 1962, returning shortly thereafter to Hawaii.
Dr. Warnick entered into his FAO contract on December 20,1962, to perform services for 1 year, extended as hereinafter related, as an animal production officer (animal physiologist) in Argentina. He and his wife (party plaintiff herein), and 'their three minor children, left their Gainesville, Florida, home on December 29,1962, and traveled by airplane from Miami, Florida, to Buenos Aires, Argentina, on December 30, 1962. They all remained constantly in Argentina until January 2, 1964, when Dr. Warnick completed performance of his FAO duties, and they arrived together at Miami, Florida, on January 3, 1964, returning immediately to their home in Gainesville.
6. Each plaintiff was issued and used for his travel to, from and in Argentina, a United Nations laissez-passer (passport), in which each plaintiff was stated to be an official of the United Nations. Each laissez-passer related that it was issued under the authority of Article VII, Sections 24 *50 to 28, of the Convention on the Privileges and Immunities of the United Nations, approved by the General Assembly of the United Nations, February 13,1946.
Dr. Wamick’s laissez-passer listed the names of his wife and three children, as members of his family accompanying him. Argentine visas were stamped on appropriate pages of his laissez-passer, one dated December 10,1962, valid for 90 days, issued by the Argentine Embassy at Washington, D.C., and the other issued by an Argentine official at Buenos Aires, Argentina, on March 27,1963, valid until November 11,1964.
Dr. Wamick and each member of his family held individual United States passports, concerning which no visas were issued for Argentina, and none of such passports was used for travel in Argentina. Dr. Warnick’s passport was issued May 13, 1960, whereas the passports of members of his family were issued in November 1962. Each passport provided for its expiration 3 years from the date of its issue, renewable upon application for an additional 2 years. On April 22,1963, Dr. Wamick’s passport was renewed to May 12,1965, a* the American Embassy, Buenos Aires, Argentina, upon his application filed the date of its approval, in which he stated that he had been in Venezuela from June 4 to July 5, 1960, and that he had been in Argentina from December 30, 1962 to date, on a United Nations laissez-passer. He further stated that he intended to reside abroad until January 4, 1964, as an expert for FAO of the United Nations.
7. Regarding the United Nations laissez-passer, the above-mentioned resolutions of the General Assembly of the United Nations provided in pertinent parts:
Section 24. The United Nations may issue United Nations laissez-passer to its officials. These laissez-passer shall be recognized and accepted as valid travel documents, by the authorities of Members, taking into 'account the provisions of section 25.
Section 25. Applications for visas (where required) from the 'holders of United Nations laissez-passer, when accompanied by a certificate that they are travelling on the business of the United Nations, shall be dealt with as speedily as possible. In addition, such persons shall be granted facilities for speedy travel.
*51 These same provisions were made applicable to specialized agencies of the United Nations, and FAO was designated as such.
8. During the times that each plaintiff was employed by FAO to render services in Argentina, there was in existence an agreement between FAO and Argentina, entitled New Standard Technical Assistance Agreement — Argentina, setting forth certain rights, conditions, and obligations between the two parties with respect to assistance to be given to Argentina by FAO, describing such technical assistance, the means of its accomplishment, the financial obligations of the parties, and various other conditions. Such agreement dealt specifically with the privileges and immunities to be accorded to experts and officials of FAO and other specialized agencies of the United Nations, and provided that Argentina would extend to such persons the privileges and immunities provided for in the previously mentioned Convention on the Privileges and Immunities of the United Nations.
9. The following regulations of the United Nations, implementing its previously mentioned Convention on Privileges and Immunities, were in effect in relation to the presence of each plaintiff in Argentina during the time of his performance of FAO services:
Section 19
Officials of the specialized agencies shall:
(a) Be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity;
(b) Enjoy the same exemptions from taxation in respect of the salaries and emoluments paid to them by the specialized agencies and on the same conditions as are enjoyed by officials of the United Nations;
(c) Be immune, together with their spouses and relatives dependent on them, from immigration restrictions and alien registration';
(d) Be accorded the same privileges in respect of exchange facilities as are accorded to officials of comparable rank of diplomatic missions;
*52 (e) Be given, together with their spouses and relatives dependent on them, the same repatriation facilities in time of international crises as officials comparable rank of diplomatic missions;
(f) Have the right to import free of duty their furniture and effects at the time of first taking up their post in the country in question.
Section 20
The officials of the specialized agencies shall be exempt from national service obligations, provided that, in relation to the States of which they are nationals, such exemption shall be confined to officials of the specialized agencies whose names have, by reason of their duties, been placed upon a list compiled by the executive head of the specialized agency and approved by the State concerned.
Should other officials of specialized agencies be called up for national service, the State concerned shall, at the request of the specialized agency concerned, grant such temporary deferments in the call-up of such officials as may be necessary to avoid interruption in the continuation of essential work.
Section 21
In addition to the immunities and privileges specified in sections 19 and 20, the executive head of each specialized agency, including any official acting on his behalf during his absence from duty, shall be accorded in respect of himself, his spouse and minor children, the privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in accordance with international law.
Section 22
Privileges and immunities are granted to officials in the interest of the specialized agencies only and not for the personal benefit of the individuals themselves. Each specialized agency shall have the right and the duty to waive the immunity of any official m any case where, in its opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the specialized agency.
Section 23
Each specialized agency shall co-operate at all times with the appropriate authorities of member States to *53 facilitate the proper administration of justice, secure the observance of police regulations and prevent the occurrence of any abuses in connexion with the privileges, immunities and facilities mentioned in this article.
10. The costs of transportation of each plaintiff ¡to and from Argentina were borne by FAO.
11. Neither plaintiff was taxed as a resident of Argentina, due to that country’s policy not to tax personnel employed by specialized organizations of the United Nations, such as FAO, in conformity with the previously mentioned Convention on Privileges and Immunities.
12. The contract of each plaintiff with FAO provided in part as follows:
8. NATIONAL INCOME TAX: FAO-derived income is liable to taxation; the staff member must therefore submit such returns as are required by his government. In certain cases, national income tax legislation, or the Convention on the Privileges and Immunities of the Specialized Agencies of the United Nations, specifically provides for exemption; it is the staff member’s responsibility to obtain from the income tax authorities a determination in this respect (after consultation with the Finance Branch at Headquarters).
Where no possibility of exemption exists, the Organization will reimburse the minimum legally-due national income taxes levied and paid by a staff member on his taxable FAO-derived income, in accordance with the laws and regulations of his national government. (Manual 371.3).
Dr. Scott — Hawaii and Argentina
13. Bom at Cody, Wyoming, on March 5, 1921, Dr. Scott attended public schools in that state, studied 2 years until 1940 at the University of Wyoming, received his Bachelor of Science degree from Oregon State University in 1944, his Master of Science degree from the University of Missouri in 1947, and his Doctor of Philosophy degree from the University of Illinois in 1954. In December 1954, he moved to Hawaii and became a member of the faculty of the University of Hawaii, as related in finding 3.
*54 14. Married in May 1950, Dr. Scott is the father of a daughter bom of the marriage in September 1951. In August 1958, he was divorced; he has not remarried; and his daughter has lived ever since the divorce with her mother at Honolulu, Hawaii. As shown by his federal income tax returns, Dr. Scott made alimony and child support payments to his former wife while he was in Argentina on his FAO assignment.
15. According to an appointment agreement between the University of Hawaii and Dr. Scott, effective July 1, 1959, his appointment as an agricultural economist on the faculty was permanent, provided his services remained satisfactory, there was a continuing need for his services, and sufficient funds were available.
16. The established policy of the University of Hawaii was that 6 years of service on certain levels of the faculty were required for allowance of a sabbatical leave to a faculty member. The maximum sabbatical leave was 1 year, and each person receiving such leave was to return to the university for service for a period of not less than 1 year.
Prior to Dr. Scott’s acceptance of the position with FAO on December 2, 1960, FAO had proposed a 2-year assignment in Jamaica or Argentina. Dr. Scott preferred Argentina, and advised that he was available for a 1-year assignment there. He was just completing the necessary 6 years of service for eligibility for a 1-year sabbatical leave, and he applied and was allowed such a leave to take the FAO assignment in Argentina.
In accordance with the sabbatical leave policy, Dr. Scott was paid one-half of his regular university salary of about $10,500 per year, while on such sabbatical leave, without regard to the salary he received from FAO.
The sabbatical leave policy of the university stated in part as follows:
(1) The location of the University of Hawaii some 2,000 miles from the nearest other institutions of higher learning makes it necessary that members of the faculty periodically take sabbatical leaves in order to maintain their position with the University. The *55 primary aim of the sabbatical leave is to maintain the professional competency of the faculty member, and to enable him to keep abreast of developments in his special field of competence.
* $ * * *
(5) Each person who applied for a sabbatical leave shall submit to the Board of Regents for its approval an outline of the project, research, or other program of study to which he proposes to devote the leave. Upon his return from sabbatical leave, the faculty member shall report to the Board of Regents in writing on his activities during his leave designed to keep him abreast of developments in his field of specialization and interest.
Faculty members rarely fail to return to their duties at the university after sabbatical leave, and then only on duly approved waiver of the sabbatical leave policy. Sabbatical leave would not be allowed to a faculty member who indicated in advance that he did not intend to return.
Dr. Scott was familiar with the policy of the university when he applied for and obtained sabbatical leave and when he left to perform his FAO duties in Argentina, and he intended to return to the university.
17. Dr. Scott’s primary assignment in Argentina under his FAO contract was to train economists for research in agricultural marketing, to develop agricultural marketing staffs in a number of experiment stations, and to develop preliminary plans for a graduate institute in agricultural economics. His primary association was with the Instituto Nacional de Tecnología Agreopecuaria (National Institute of Agriculture and Animal Husbandry). In addition to training economists for the Institute to engage in agricultural marketing research in various experiment stations, he also trained persons in agricultural marketing. All persons trained by Dr. Scott were Argentines.
18. Prior to the contract date of December 2, 1960, there was considerable correspondence between FAO and Dr. Scott.
On July 18, 1960, Dr. Scott applied for the position of FAO marketing adviser in Argentina.
*56 On August 31, 1960, FAO advised that be bad been approved by tbe Government of Argentina, and that tbe FAO personnel branch had been requested to make him a formal offer of appointment. This letter advised with respect to administrative conditions applicable to tbe assignment as follows:
For the proposed 12 months assignment you would receive from FAO $11,060 net of income tax. * * *
In addition you would receive an installation grant of $180 to assist you in settling in Buenos Aires. Should your child accompany you, you will be paid $360 for yourself and half this amount for your child. On most of these emoluments you would have to pay U.S. Federal Income Tax which would be reimbursed to you by FAO. No income tax would be imposed by the Government of Argentina. In appreciating the value of this salary it may be noted that the cost of living in Argentina is relatively low and is rated by the U.N. Class B ( — 10%) whereas New York is going to be classified 1 (+30%).
^ ^5
19. On September 8, 1960, Dr. Scott filed his application for sabbatical leave from December 1,1960, through November 30, 1961, with the Board of Regents of the University of Hawaii, and regarding the plan of work contemplated in Argentina, stated as follows:
^ Í í
1. To conduct a course on research methodology in mar- ■ keting agricultural products.
2. To conduct a course in market development for the primary purpose of training personnel for establishing market development and extension programs.
3. To supervise efficiency studies with respect to the different phases of marketing between the producer and the consumer.
4. To plan and direct marketing investigations to be carried out by technicians trained in the above mentioned courses.
This program involving (a) a study of the needs of market development programs for Argentina agricultural products, (b) teaching methodology to government economists, and (c) recommending and supervising market development projects for individual commodities is *57 probably the most productive sabbatical program obtainable for the particular applicant from the standpoint of development of the individual, service to the department and the University as well as to the United Nations since it is directly related to the applicant’s specialized field of research and teaching. In face of Hawaii’s critical need 'for research in market development for diversified agricultural products, the applicant has been one of the few agricultural economists in the nation primarily engaged in this new and increasingly important field of marketing research and has been asked to be the primary speaker on controlled experiments in marketing research at the forthcoming November meeting of the Marketing Eesearch Committee of the Western ‘Agricultural Economics Eesearch Council. Eealizing the importance of measuring market potentials and determining methods and costs of market development, a western regional research project has been approved in this field in which a considerable amount of the Hawaii work is being used as background material.
Additional benefits from the study and research hi Argentina would enhance the applicants knowledge of international trade as background for a project in international trade to be activated by the HAES Department of Agricultural Economics. Further experience in applying and developing marketing research methods and further understanding of the part played by agriculture in economic development would also be of value in advising and teaching students in the graduate program in agricultural economics at the University of Hawaii of Which the applicant is advisor.
‡ ^ $
20. By letter to Dr. Scott, dated September 14,1960, FAO offered him an appointment as Marketing Adviser on a Technical Assistance Mission to the Government of Argentina, and stated in part as follows:
* * * The duration of this appointment will be for one year and you will be required to report initially in Washington D.C. on or 'about 1 October 1960* provided all necessary clearances have been received by that time.
The asterisk in this quoted part referred to the postscript to the letter, as follows:
*P.S. The Economic Analysis Division have just informed me that they have received your letter in which *58 you request that your appointment be effective on or about 1 December 1960, and that they are in agreement with the date indicated by you.
Dr. Scott requested the postponement to December 1, 1960, because he was engaged in an uncompleted research project.
21. On October 11,1960, Dr. Scott filed a passport application with the United States Department of State, advising that the purpose of his trip was to fulfill a United Nations (FAO) position as Marketing Adviser in Argentina, that his approximate date of departure from Honolulu, Hawaii, was December 1, 1960, and his proposed length of stay in Argentina was 1 year.
22. By letter to Dr. Scott, dated October 24, I960, the university president advised him that his request for sabbatical leave from December 1, 1960, to November 80, 1960, had been approved by the Board of Regents. After restating Dr. Scott’s plan of work as set forth in his application, the letter concluded as follows:
# * % % *
It is further understood that, when you return, you will submit to my office a full report of your activities during this period. A concise report covering specific dates, distances, and accomplishments is required also by the Office of Internal Revenue if you are to benefit by the tax allowances for sabbatical travel. The Regents are always desirous of knowing how sabbatical leaves have helped in professional improvement.
As you know, Regents’ rules provide that no administrative official of the University or any other person is authorized to make any commitment or agreement with regard to your leave or the possible extension of the leave in addition to the terms specifically stated in this letter.
Dr. Scott intended to prepare and submit a report of his activities on sabbatical leave, at the time he submitted and accepted such leave.
23. By letter to Dr. Scott, dated November 11,1960, FAO advised him in detail concerning his transportation from Hawaii, via Los Angeles, Mexico City, and Santiago, to Argentina, supplied him with his formal letter of appointment, and concluded with the following inquiry:
*59 Although your letter of appointment suggests a duration of one year, would you have any objection to prolonging your stay so as to return to U.S. territory not earlier than 1 January 1962? If so, this would have some financial benefit to you and rather significant financial advantage (regarding tax reimbursement) to FAO.
Apparently, Dr. Scott shortly thereafter conferred with the head of his university department concerning this inquiry, as indicated in finding 39.
24. Dr. Scott’s contract with FAO contained among others the following notations:
Permanent Residence for all Administrative Purposes:
Honolulu, Hawaii
Duty Station: Buenos Aires, Argentina
Title: Agricultural Economist (Marketing Adviser)
Grade and Salary: F-4-IX USA $9,250 per annum
Payable in: USA Dollars and Argentine pesos
25. Dr. Scott owned a home in Kailua, Hawaii, at the time he left for Argentina in 1960. On December 2,1960, the day before his departure, he entered into a rental agreement with a tenant, by the terms of which agreement, the home, together with household furnishings and fixtures, were leased to the tenant for 6 months, ending June 3,1961. The home had two bedrooms, cooking facilities, living room and dining room.
While Dr. Scott was in Argentina, at the expiration of the rental agreement, a second lease for 6 months was arranged by a personal friend with the same tenant. The tenant occupied the home continuously for about 12 months. Dr. Scott resumed his occupancy of the home upon his return from Argentina in January 1962.
In accordance with the rental agreements, the tenant deposited the rental payments in Dr. Scott’s account at the Kaimuki Branch of the First National Bank of Hawaii, Honolulu, Hawaii.
26. Upon his arrival at Buenos Aires, Argentina, Dr. Scott stayed at a hotel for about a week, during which time he looked for an apartment to rent.
27. About mid-December 1960, Dr. Scott entered into a 1-year lease of a furnished apartment in a newly constructed *60 eleven-story apartment building in Buenos Aires. It was a studio apartment, with combination living room and bedroom, separate kitchen and bath. He was one of the first tenants of the building. The other tenants were Argentines, Cuban refugees, and one American, a public school teacher who became a tenant several months later. Dr. Scott kept the apartment during his entire stay in Argentina, and resided there except when his duties required him to be out of Buenos Aires. He provided blankets, linens, miscellaneous cooking utensils, and the like, a portable radio, and a reading lamp. He owned no real estate in Argentina.
28. Dr. Scott’s post of duty, or headquarters for his FAO assignment, was at Buenos Aires. He first spent about a month traveling throughout Argentina to familiarize himself with the country and its marketing problems. For 4 months, he conducted training courses for Argentines in agricultural marketing in classroom facilities furnished by the University of Buenos Aires. Thereafter, his duties periodically required rather extensive travel throughout Argentina. Each trip usually lasted for 2 weeks, and he traveled in a chauffeured automobile with two Argentine members of the staff and an interpreter. They traveled to an agricultural experiment station in one of the provinces, where they met with one or more of the persons Dr. Scott had previously trained in Buenos Aires. Such person or persons would arrange for tours throughout the province to determine agricultural marketing problems. Most of each 2-week period was spent in contacting producers, wholesalers, processors of agricultural products, and agricultural cooperatives, to discuss marketing problems. Dr. Scott’s travel and contacts were with Argen-tines. Upon his return to the experiment station, he presented his views to Argentine technicians as to how an agricultural marketing research program could best be developed for that area.
On such trips, Dr. Scott dined and lodged with his Argentine associates. At times, he and his staff would be invited to spend the night at a ranch, and occasionally the rancher would hold a party for them.
*61 29. While in Buenos Aires, Dr. Scott always prepared and had breakfast in his apartment, always had lunch out with his Argentine trainees or associates, and sometimes had his evening meal in his apartment, but sometimes elsewhere, and then most often quite late and alone, but occasionally joined by friends. In Hawaii, he 'had dinner at home more often than he did in his Buenos Aires apartment.
Dr. Scott occasionally entertained or had people to dinner in his Hawaiian home, but never in his Buenos Aires apartment, except that friends visited him.
30. In Buenos Aires, Dr. Scott ate a)t a neighboring Argentine restaurant, and shopped at neighboring Argentine stores, frequented almost entirely by Argentines.
31. As in the case of his FAO employment associations, Dr. Scott’s social contacts in Argentina were almost exclusively with Argentines, mostly with persons involved in his FAO assignment, but also with others. He dated Argentine women on occasions, developed a close acquaintance with an Argentine whom he met in the neighboring restaurant, took care of the children of an Argentine associate one evening, attended the baptism of a child of another, became acquainted with the families of several of his Argentine associates, and accepted invitations to United Nations functions, attended mostly by Argentines, with some Europeans but no Americans present. He was entertained individually by Argentines connected with agricultural marketing cooperatives, apart from the functions he attended with his FAO associates. He also attended some parties held by Argentines to whom he was introduced by the American teacher who lived in his apartment building, although his contacts with the American were limited.
He declined numerous invitations to affairs held by the American and British Embassies. He wanted to take advantage of his stay in Argentina, learn the customs of its people, and be accepted by the Argentines, not considered an American isolated within his own group.
Since his return from his Argentine assignment, Dr. Scott has corresponded with about 15 of his Argentine associates *62 over tbe period of 5y2 years up to the date of the trial of this case.
32. Nr. Scott received most of his personal mail, while in Argentina, at his Buenos Aires apartment. He testified that he received no mail in Hawaii during that time.
While in Argentina, Dr. Scott continued his memberships in professional societies in the United States, concerning which he provided no change of mailing address from Hawaii to Argentina, since he only expected to be gone from Hawaii for a year. The record is silent as to whether or not anything was mailed by any such society. He did change his mailing address with the United States Department of Agriculture, and received its publications in Buenos Aires.
33. While in Argentina, Dr. Scott founded and organized the Agricultural Marketing Research Society, an Argentine association, which held its first meeting in Buenos Aires from December 4-7, 1961, after several months of planning. He also selected a committee to establish an association of agricultural economists in Argentina. After his return to Hawaii, Dr. Scott had no knowledge of the status of either organization. Fie joined no other clubs or associations in Argentina.
Dr. Scott has had no church membership, did not attend church in Argentina, and since 1954, only two or three times in Hawaii.
34. While in Argentina, Dr. Scott maintained a checking account at the Buenos Aires branch of the First National Bank of New York. The FAO advised him to use that United States bank because of the instability of local banking institutions in Argentina. Argentines themselves use extensively branch facilities of foreign banks. Dr. Scott also maintained his checking account at the First National Bank of Hawaii in Honolulu. Flis bank statements were mailed to him at his Buenos Aires apartment. About 50 percent of his FAO salary was deposited in the Buenos Aires bank, and he used these funds to provide for himself in Argentina.
Dr. Scott also maintained a savings account at the University of Hawaii Federal Credit Union. While in Argentina, he made deposits to this account, was credited with interest on such account, and also made payments on an *63 outstanding loan from that organization, which continued to carry his Hawaiian home address on its accounts.
35. While in Argentina, Dr. Scott became interested and investigated the prospects of participating in two business ventures there. One involved consideration of a joint investment with Dr. Rossini and Dr. Lauria, both Argentines closely associated with Dr. Scott in his FAO assignment, for the purchase of 2,500 acres of desert land near Mendoza for grape production. He also became interested in the purchase of a sheep ranch in southern Argentina.
Neither prospective deal was consummated. There is no evidence that either reached the point of substantial negotiations. In any event, it is concluded that Dr. Scott did not abandon 'his intent to return to the University of Hawaii at the conclusion of his FAO assignment in Argentina, but that these circumstances are substantial evidence concerning the nature of Dr. Scott’s intentions concerning his presence in Argentina during his FAO assignment there. ■
36. Dr. Scott studied the Spanish language in Argentina, taking formal lessons for about 2 months and studying in private 2 or 3 hours daily. He also learned from his associates, some of whom spoke only Spanish, requiring him to converse only in such language on occasions, and he became proficient enough to do so, although he resorted to English in conversing with an Argentine who spoke English well. Although his oral vocabulary was limited, he was able to read Spanish and did read the Buenos Aires newspapers and some Spanish journals.
37. Dr. Scott was provided for about 6 months with two successive interpreters, who performed during the period of 4 months of lectures delivered by Dr. Scott in English to his Argentine trainees at the University of Buenos Aires, and also in numerous conferences. The second interpreter was the Dr. Lauria, previously mentioned in finding 35, who was a medical doctor, who became a close friend of Dr. Scott.
Near the end of his stay in Argentina, Dr. Scott presented a 15-minute radio program in Spanish, sponsored by the United Nations.
*64 38. During the year 1961, while Dr. Scott was in Argentina, his name and Hawaiian home address were listed in the Honolulu telephone directory. There is no evidence as to when such directory was published, nor as to when, if at all, there was publication of a successor edition.
Dr. Scott had voted in Hawaii prior to his being in Argentina, and once after his return, during the 514-year period up to the time of the trial of this case.
Dr. Scott had Hawaiian credit cards, which he did not dispose of on account of this Argentine assignment. He obtained no credit cards in Argentina, but there is no evidence as to the extent, if at all, to which such credit practices were employed in Argentina.
During the year 1961, Dr. Scott paid Hawaiian property taxes, federal income taxes, and Hawaiian state income taxes.
There is no evidence that Argentina had a system of drafting persons into its armed services, or what persons were subject thereto, if any such system existed. Dr. Scott made no inquiry about the matter, assuming that he would be ineligible on account of his age, if in fact such a system existed.
During 1961, Dr. Scott owned life insurance policies previously issued by two United States insurance companies. He did not purchase insurance in Argentina.
Dr. Scott owned an automobile in Hawaii. By prearrangement, it was sold shortly after his departure for Argentina. He had a permanent driver’s license for Hawaii, which did not require renewal during his absence. He did not own an automobile in Argentina, nor did he drive an automobile there, and made no effort to obtain a driver’s license for the purpose. The United Nations provided him with a chauffeured automobile whenever needed by him. He used the Buenos Aires system of public transportation by bus and subway, which he described as a very good city system, in contrast to the very poorly equipped public transportation system in Honolulu. In Hawaii, Dr. Scott resided 16 miles from Honolulu; in Argentina, he lived in Buenos Aires, where his headquarters was located. In Hawaii, Dr. Scott used his automobile extensively.
*65 39. While in Argentina, Dr. Scott transmitted the following letter, dated May 25,1961, to the bead of the Department of Agricultural Economics, University of Hawaii, requesting a 1-montb extension of leave from the University:
Simultaneously with the approval of my sabbatical leave which permitted an absence of 12 months to accept a marketing advisory position with the United Nations, the UN requested that my employment be extended one additional month to January 1, 1962. At that time, you advised me to submit my request just prior to the beginning of the 1961-62 fiscal year for obtaining approval of the minor supplementary request.
At this time, therefore, I wish to request that I be permitted to utilize 22 working days of vacation credit during the month of December, 1961, in order to permit continuation of my UN employment until January 1, 1962.
40. On October 12, 1961, Dr. Scott wrote to the Chief, Marketing Branch, Economic Analysis Division of FAO, Borne, Italy, enclosed a field report, advised that he was holding a conference for his entire marketing group in December, and stated further as follows:
*****
The work in Argentina is progressing according to schedule and it appears that January 1, 1962, would be the best termination date for my assignment, possibly permitting departure on or about December 20 through the utilization of accumulated vacation leave. This date is identical to that suggested by Mr. Green of the North American Begional Office at the time of my appointment.
I am in the process of writing manuscripts on the following subjects: (1) Basic considerations in the development of an agricultural marketing research program in Argentina and (2) Economic problems of Argentine agriculture. I do not expect to complete these manuscripts prior to my departure from Argentina, but would appreciate the opportunity of submitting them to you for review at a later date.
41. On November 2, 1961, Dr. Scott wrote to Mr. Morris Green (mentioned in the last quoted letter above), Begional *66 Administrative Officer of FAO’s North American Begional Office, Washington, D.C., as follows:
In your letter of November 21,1960, just prior to my appointment with FAO in Argentina, you suggested that I terminate my assignment not earlier than January 1, 1962.
Inasmuch as I have not utilized my annual leave, I would appreciate your advice as to whether the above requirement would be met if my assignment were scheduled for termination on January 1,1962, but permitting departure from Argentina on or about December 20, 1961, with the remaining working days from December 21 to January 1 charged to travel and accumulated leave?
Except for the utilization of annual leave as suggested above, all authorized annual leave has been unused.
If the above meets with your approval, I would appreciate authorization for reserving airline space and making other necessary arrangements for departure from Buenos Aires for Honolulu on or about December 20.
42. By letter dated November 4, 1961, from Borne, Italy, to Buenos Aires, Argentina, FAO’s Chief, Marketing Branch, Economic Analysis Division, advised Dr. Scott as follows:
We have now obtained formal approval for the extension of your assignment until the end of the year. You can, therefore, make your plans on the basis of the dates you put forward in your letter of 12 October, with the departure from Argentina on or about 20 December.
43. By letter dated November 9, 1961, to his Ohief at Borne, Italy, Dr. Scott provided another field report, and stated further as follows:
I am arranging my work schedule to permit termination of my Argentine assignment between December 20 and January 1.1 would prefer to depart for Hawaii on or about December 20, but can make effective use of my time until January 1 if the latter date is considered more favorable by FAO for administrative or fiscal reasons. Please note the enclosed copy of a letter to Mr. Morris Green of the North American Begional Office.
Also enclosed is field report No. 9.
*67 44. By letter dated December 14, 1961, from Nome, Italy, to Buenos Aires, Argentina, FAO’s Chief, Finance Branch, advised Dr. Scott as follows:
As you will have fulfilled the residence requirements under Section 911(a) (1) of the U.S. Internal Revenue Code — bona fide residence in a foreign country for an uninterrupted period which includes an entire taxable year — after the close of the year, you will be able to claim tax exemption on your FAO income earned abroad.
In order to assist you in finalizing your tax matters for 1961 insofar as FAO income is concerned, we have prepared the enclosed Form 2555, “Statement to Support Exemption of Income Earned Abroad”. A statement of FAO income is also enclosed for information, which shows the breakdown of your earnings as between tax-exempt and taxable amounts, and notes the figure which has been inserted in Form 2555, and that which is to be reported in your 1961 Tax Return.
Form 2555, together with your Tax Return for 1961, should be forwarded to the District Director of Internal Revenue in the District where your Returns are normally lodged, sometime after 31 December 1961, but before the April 1962 due date for filing Returns.
45. Although Dr. Scott’s employment with FAO terminated in early January 1962, he was paid by FAO until about February 1962, since he had about iy2 months of accumulated leave at the end of his employment. He completed and submitted his work report to FAO in April 1962.
46. The catalog of class schedules of the University of Hawaii for the year 1962 showed that Dr. Scott was to teach a class commencing in February 1962. Such catalog is prepared 1 to 11/2 years prior to its effective date.
47. The official report of personnel action, dated February 2, 1962, prepared by FAO’s Personnel Branch, stated that Dr. Scott’s FAO appointment was for an intermediate term of 13 months, not to exceed January 1, 1962, which was extended through January 4, 1962, with separation on that date. The report stated that Dr. Scott’s permanent residence for all administrative purposes was Honolulu, Hawaii, but indicated Buenos Aires, Argentina, as his duty station. Such report contained a notation as to banking in *68 structions, naming the First National Bank of Hawaii, Kai-muku Branch, Honolulu, Hawaii, but this obviously referred to salary remaining unpaid at the time the report was prepared.
48. On January 17,1962, Dr. Scott submitted his Report on Sabbatical Leave to the Board of Regents, University of Hawaii, a lengthy and informative review and analysis of his performance of his FAO assignment. He stated that his period of leave was from December 2,1960, to January 5,1962. In his letter of submittal, he stated with respect to benefits derived by him, as follows:
$ $ ‡ ‡
This assignment, which afforded me the opportunity to lecture to advanced, mature students and to familiarize myself with all aspects of the marketing of agricultural products for an entire nation, has given me an invaluable experience contributory to my research and teaching program at the University of Hawaii. In this assignment I was concerned not only with a training program, but also with the development of agricultural marketing departments in nine agricultural experiment stations; with the relationship between agricultural marketing research, extension and farm management; with coordination of the functions of agricultural marketing research among the various agencies at the national level; and with the development of plans for an institute of agricultural economics. I organized a national marketing association for presentation of professional papers for which I sponsored the first 4-day conference. Upon receipt of the proceedings of this conference, I plan to translate some of ithe more outstanding papers from Spanish into English. Also, I chose a committee to establish an Argentine Association of Agricultural Economists.
49. While Dr. Scott was on leave from the University of Hawaii for Ms FAO assignment, his imiversity office was occupied by another member of the faculty, with the understanding that it would be restored to Dr. Scott when he returned, which was in accordance with the policy of the university concerning professors returning from sabbatical leave. While he was in Argentina, about one-half of Dr. Scott’s books, records, and documents were stored in Ms office, and *69 tbe other half stored in his home. Dr. Scott’s name remained on his office door, and his office was restored to him upon his return to the university.
50.On February 14, 1962, Dr. Scott filed a state income tax return for the calendar year 1961 with the Department of Taxation, State of Hawaii, covering only his income in 1961 in Hawaii, not including any FAO income. He stated his occupation as university professor, his address as that of his Hawaiian home, his place of employment as Honolulu, and his employer as the University of Hawaii. In such return, he itemized as deductions a contribution to the local Community Chest, amounts paid for real estate taxes in Hawaii, and a state auto license tax.

Dr. Scott and the Interned Revenue Service

51.The following income was received by Dr. Scott during the taxable years 1961 and 1962:

Source 1961 1962

University of Hawaü__ $7, 036. 90 SI? 954. 00
Rental income &■ inter.¡sr— ___ 1,075.82 0
Food and Agricultural Oigan; aftior._. .. 9,170.82 Í, 499.10
Totals- 17,283. 54 15,453.10
52.Dr. Scott filed his federal income tax returns for taxable years 1961 and 1962 respectively on February 14, 1962, and February 6, 1963. In such returns, he reported the following tax withholdings and tax liabilities:

1961 1962

Tax withheld_ 105.37 $2,089.80
Tax TabilUj — — 8?1.63 3,660.00
223.74 429.80 Overpayment (reiard claimed)_
53.For the taxable years 1961 and 1962, Dr. Scott excluded from his gross income the income he earned from FAO on the ground that he was a bona fide resident of a foreign country for an uninterrupted period which included an entire taxable year under § 911 (a) (1) of the Internal Revenue Code of 1954.
*70 Attached to each return was official Form 2555, Statement to Support Exemption of Income Earned Abroad, in which Dr. Scott asserted that he was a bona fide resident of Argentina from December 7, 1960, to January 1962, where he was employed by FAO with his duty station at Buenos Aires, and advised as to the amount of salary he had received from FAO in each year.
54. In his federal income tax return for the taxable year 1961, Dr. Scott deducted interest payments made to the University of Hawaii Credit Union, the First National Bank of Hawaii, the Pacific Mutual Life Insurance Company, Sherman Dowsett, and Natalie Arliene Graves, all American corporations or individuals. He made no interest payments to any non-American recipients in 1961.
He also deducted real estate taxes, state income taxes, automobile tax, and a contribution to the Community Chest, all paid in Hawaii in 1961.
55. By letters dated August 9, 1963, the District Director of Internal Revenue, Plonolulu, Hawaii, asserted a deficiency of income tax against Dr. Scott in the amounts of $3,090.67 for 1961 and $379.90 for 1962, after allowance of credits and claimed refunds. Such deficiency assessments were based upon disallowance of exclusion of the FAO income under § 911(a) (1) on the determination by the Internal Revenue Service that Dr. Scott was not a bona fide resident of Argentina.
56. By notice of March 26,1965, the same District Director provided Dr. Scott with separate statements of tax due for 1961 and 1962, showing tax and interest due as follows:

1961 1962

Tax due_.$3,090.67 $379.90
Interest _ 546.46 44.37
Totals_ 3, 637.13 424. 27
Dr. Scott paid these amounts on April 29, 1965, and on June 7, 1965, further amounts of interest of $20.32 for 1961 •and $2.49 for 1962. Thus, the total amounts paid by him on the deficiency assessments were $3,657.45 for 1961 and $426.76 for 1962.
*71 57. On. July 23,1965, there were timely filed on behalf of Dr. Scott with the same District Director separate claims for refund of income tax for the years 1961 and 1962, asserting the same grounds for recovery alleged in his petition timely filed in this court. These claims were disallowed in full by the District Director by letter dated November 4, 1965.
Dr. Wa-mick — Florida and Argentina
58. Born at Hinckley, Utah, on November 15, 1920, Dr. Warnick attended public schools there, received his Bachelor of Science degree from Utah State University in 1942, served in the United States Air Force until 1945, and received his Master of Science degree in 1947 and his Doctor of Philosophy degree in 1950, both from the University of Wisconsin. He served as assistant professor in the Department of Animal Science, Oregon State University, from 1950 to October 1953, and thereafter served as a member of the faculty of the University of Florida, as related in finding 3.
59. Dr. Warnick and plaintiff Barbara W. Warnick, also a native citizen of the United States, were married on August 20, 1947, and ever since have been and now arc husband and wife. Three children were born of the marriage, John Alvin, Barbara Ann and Mary Louise, who became respectively 12, 8 and 3 years of age during their stay with their parents in Argentina.
60. The University of Florida had no sabbatical leave program at times relevant to Dr. Wamick’s case, and his FAO services were performed in Argentina on leave of absence without pay, granted by the university as hereinafter related.
61. Dr. Warnick’s assignment in Argentina under his FAO contract was as the animal production officer (animal physiologist) on a team of FAO experts, and his post of duty was at the Argentine experiment station at Balcarce, Argentina. He had four Argentine veterinarians assigned to him, and in accordance with his duties, taught them and other Argentines methods and philosophies of research and supervised actual experimentation with beef cattle of Argentina *72 to determine the reasons for their low reproduction rate, and to find solutions to improve their fertility levels, working in conjunction with Argentine beef cattle ranchers. Dr. War-nick’s association was with the Instituto Nacional de Tec-nología Agropecuaria, and all persons involved in his work were Argentines.
62. Some time prior to his FAO assignment, Dr. Wamick was recommended by the chairman of his university department to FAO’s head of all livestock programs as well-qualified for the assignment. Correspondence thereafter occurred between FAO and Dr. Warnick until the pertinent contract was reached in December 1962.
By letter dated November 20,1961, FAO advised Dr. War-nick that it was in the process of recruiting a seven-member team of experts to carry on a 5-year project in Argentina, that there was need for an animal physiologist to work with problems of low fertility, that the need was for someone for 5 years, but that FAO was prepared to recruit for 2 years, or even for 1 year, if necessary. FAO expressed hope that Dr. Warnick would be in a position to consider a 2-year appointment. FAO acknowledged that it was informed that Dr. Warnick would not be available until the third quarter of 1962, and indicated that such would be satisfactory because more time was required to recruit other members of the team, and because the project manager, yet to be recruited, would have to spend several months in Argentina prior to the arrival of the other members of the team. FAO further advised Dr. Warnick that its personnel branch would contact him in the near future concerning an official offer of appointment.
63. By letter dated May 15, 1962, FAO advised Dr. War-nick that it was proceeding with the formalities of his recruitment as animal physiologist for the Argentine project, the assignment to commence September 1, 1962, inquired whether Dr. Wamick would be on sabbatical leave, and if so, whether on full-time or part-time pay from his university, and stated that he was being proposed to the FAO personnel branch for a 2-year assignment. Dr. Warnick was requested *73 to advise whether in accordance with Ms previous letter, he conld initially consider only a 12-month assignment, which his university might extend for an additional 12 months.
64. By letter to FAO, dated June 1, 1962, Dr. Wamick responded that he was ready to accept the appointment on a 12-month basis to begin September 1, 1962, but that the university had informed him that a second 12-month appointment would not be approved. He stated that he would be on leave without pay, and that the FAO salary would have to be adequate to cover expenses.
65. By letter to Dr. Wamick, dated June 8, 1962, FAO responded that it would be much more convenient for him to start the assignment beginning January 1963, since some preparatory work had to be done by the project manager, and that FAO was prepared to agree to Dr. Warnick’s recruitment as of that date.
By letter dated June 28,1962, Dr. Warnick replied to FAO that January 1963 was a satisfactory commencement date. Dr. Warnick was engaged in teacMng assignments at the university in the fall of 1962, and apparently was already scheduled to do so, when he agreed to postponement of commencement of his FAO assignment until January 1963.
66. Dr. Warnick then received the official offer of appointment from FAO’s personnel branch, and by letter dated July 5, 1962, was advised by FAO that the commencement date stated thereon, September 1, 1962, should be changed by Dr. Warnick to January 1, 1963, before signing and returning such offer.
67. Although the University of Florida agreed only to a 1-year leave of absence for Dr. Warnick to accept the FAO assignment, the head of his university department advised him that if the university did not require his services, he should ask and would probably be granted an additional leave of absence.
68. While it was clearly understood that Dr. Wamick would be on leave of absence without pay from the university for 1 year, such leave was in the form of two successive allowances, the first through June 30, and the second through. De *74 cember 31, 1963, to meet the technicality that the university operated on an academic year from July 31 to June 30.
The university granted leaves of absence only to faculty members who intended to return, and this policy was understood by Dr. Warnick. Both the university and Dr. Warnick expected that he would return at the end of his 1-year leave of absence, or at the end of any extension thereof, which might be granted if the university did not require his services.
69. Dr. Wamick’s contract with FAO contained among others the following notations:
Permanent Residence for all Administrative Purposes: Gainesville, Florida
Duty Station: Castelar, Buenos Aires, Argentina
Title: Animal Production Officer (Physiology-Nutrition and Reproduction)
Grade and Salary: P-4 Step I. U.S. $8,930 per annum
Payable in: U.S. $ and Argentinian Pesos
The stated salary, however, had been increased in separate negotiations.
70. Dr. and Mrs. Warnick owned a home at Gainesville, Florida, which they occupied with their children before and after their absence on account of Dr. Wamick’s FAO assignment in Argentina.
Shortly before his departure on December 29, 1962, Dr. Warnick rented the home, together with furniture and furnishings, from January 1, 1963, to August 31, 1963, to Dr. Norman Joels, a visiting professor from England, who had previously contacted Dr. Warnick concerning the matter.
The Warnicks arranged to have a neighbor, Mrs. Huffman, collect the rent, deposit it in Dr. Wamick’s checking account in a Florida bank, arrange for repairs of the home, and provide another tenant upon Dr. Joels’ departure. Mrs. Huffman was instructed to arrange a further tenancy until December 31, 1963, to assure availability of the home for use of the Warnicks by January 1, 1964. For the period September 1, 1963, to December 31, 1963, Mrs. Huffman rented the home to Dr. Kruse, a retired professor from Connecticut, who vacated the premises at the end of that period, even though he remained in Gainesville, Florida.
*75 While in Argentina, Dr. Warnick made mortgage payments on his Florida home.
Dr. Warnick applied for and was granted homestead exemption for tax purposes on his Florida home for each of the years 1956 through 1963. The application for 1963 was made and allowed on November 21, 1962. Each application form contained the statement: “I reside thereon [the Florida property involved] and in good faith make the same my permanent home.”
71. Upon the arrival of Dr. Warnick and his family at Buenos Aires on December 30, 1963, they stayed at a hotel for about 2 days, and then traveled by airplane to Mar del Plata, Argentina, where they stayed at a hotel for about 2 weeks, during which time they arranged for lease of a home.
Through a local Argentine real estate agent, recommended by an Argentine associate, Dr. Warnick entered into a lease agreement, printed and typewritten in Spanish, for a home in Mar del Plata, for the period from January 17, 1963, to April 30, 1963, which Dr. Warnick and his family occupied for that period and then vacated because such home was constructed for summer living’, lacked heating facilities, and the cold weather seasons of Argentina were commencing.
Dr. Warnick then rented another home in Mar del Plata, which he and his family occupied until January 2, 1964, when they departed for their return trip to Florida. This second home, offered to the Warnicks for the duration of their stay in Argentina, belonged to an Argentine who had become a close friend of the Warnicks as a result of the membership of his wife and two daughters in the same church attended by the Warnicks in Mar del Plata.
Mar del Plata was a coastal city of about 330,000 inhabitants, located about 250 miles from Buenos Aires. It was located about 45 miles from Dr. Wamick’s duty post at the experiment station at Balcarce, where there was a community of about 4,000 persons, where no housing was available, with the result that more than half of the Argentines working at the experiment station lived in Mar del Plata and commuted daily.
*76 72. Both of their homes ill Mar del Plata had basic furniture and furnishings, and the first one was particularly well-equipped. However, the Warnicks provided additional items such as lamps, cooking and electrical utensils, dishes, silverware, a baby’s crib, towels, blankets, linens, a washing machine, a table and chairs, and a voltage transformer. Some of these were brought from Florida to Argentina with them in their 1,600 pounds of personal belongings transported.
The first home was located near the ocean in an area of summer houses, and the neighbors were Argentines, mostly from Buenos Aires, spending their summer vacations in Mar del Plata.
The second home was located about 2y2 miles from the first, in an Argentine working class neighborhood of modest and average homes, occupied entirely by Argentines.
The Warnicks redecorated the second home, painting inside and out, constructed a carport and breezeway, bought curtains for the windows, and converted a bedroom into a dining room.
73. Dr. Warnick’s FAO assignment required bim to make periodic trips in the northern provinces of Argentina. Such trips generally lasted for 2 or 8 days each, except that occasionally one involved a week or 10 days. They occurred about twice a month. Some of the travel was by a small airplane piloted by an Argentine, and the rest by automobile or pickup truck. He was accompanied by his assigned Argentine veterinarians and other Argentine members of the project. On such trips, Dr. Warnick and his staff visited ranches, and conducted research and held short courses and seminars for ranchers and cattlemen. On occasions, they stayed overnight at the ranch visited. Dr. Warnick dined and socialized with his travel companions, and shared hotel rooms with them.
Dr. Warnick also gave lectures and conducted courses on reproductive physiology at several institutions, such as the National University of Buenos Aires, and experiment stations in Santa Fe Province, Corrientes Province, and La Pampa Province, in addition to the one at Balcarce.
*77 Dr. Warnick bad been warned that water in outlying areas might not be safe to drink, and be took precautions in this respect.
74. Except when away on a trip, Dr. Warnick commuted on workdays between bis home in Mar del Plata and bis duty post at Balcarce. He generally left bis home about 6:25 a.m. and arrived back about 7:30 p.m. He ate breakfast at home with bis wife, without waking the children, bad lunch with bis Argentine associates at a cafeteria in Balcarce, and dinner with Iris entire family at home. He spent most weekends at home or otherwise in the company of bis family.
75. Mrs. Warnick purchased food and supplies for the family at various Mar del Plata shops and markets, all operated and patronized by Argentines. She shopped every day because of lack of adequate refrigeration facilities, even on Sunday. At times she walked to market, or traveled by bicycle, and when the Warnicks received their new automobile in Argentina, she drove to town once a week to make purchases.
Mrs. Warnick bad a small refrigerator with limited capacity for storage of food. She was told that it was not safe to keep meat for longer than 24 hours. She purchased milk in cartons, which went sour on the second day. She was advised that bottled milk would have to be boiled.
76. John Alvin and Barbara Ann, the two Warnick children of school age, attended respectively the sixth and third grade classes of a local Argentine school, National School No. 20, when the school year commenced at about the time the Warnicks moved into their second home. The school was located nearby. The classes were conducted entirely in Spanish, and for 4 hours in the morning. John Alvin had had some Spanish instruction in Florida. Both children wore school uniforms, as required for all students.
In addition, the Warnicks hired a private tutor, an Argentine public school teacher, who taught the two children for 2 hours each schoolday afternoon, using Florida textbooks and materials which the Warnicks had brought with them, the purpose being to keep the children abreast of their grades in the Gainesville, Florida, schools. The afternoon *78 sessions helped the children learn Spanish, as the tutor provided them with some instruction in that subject.
John Alvin remained in the public school throughout the school year until late 1963, completing the sixth grade, rated as an outstanding student. Barbara Ann attended the third grade until July 9, 1963, when the Warnicks removed her from the public school because they concluded that at her age, then 7 years, the regular schooling and the tutoring were too much for her, and they thought that it was more important for her to keep up with her American classmates than to complete the Argentine third grade.
Throughout their stay in Argentina, the two children associated extensively with Argentine children, both in school and otherwise, and they learned to communicate with them well in the Spanish language. John Alvin became fluent in Spanish.
77. The Warnicks were all active members of the Mormon Church. They held membership in the local church at Gaines-ville, Florida, which they transferred to the local Mormon Church in Mar del Plata. All members there were Argen-tines except the Warnicks and an American citizen (and his wife) who had been sent on a mission by the Mormon Church from Arizona to Mar del Plata to supervise construction of a new church.
Services were conducted in Spanish. The Warnicks regularly attended Sunday meetings, the children attended a weekly afternoon class in primary religious training, and the whole family actively participated in the social functions of the church. For example, Barbara Ann took part in a Christmas program held by the church.
Dr. Warnick and John Alvin provided labor on Saturdays and holidays in the construction of the new church chapel, and Mrs. Warnick assisted other women in providing food for the construction workers. Dr. Warnick also contributed financially to the building program.
Upon reaching 12 years of age, John Alvin became eligible, was considered qualified, and was ordained at the Argentine church as a deacon, the first level of priesthood in the Mormon Church.
*79 78. Dr. and Mrs. Warnick bad very limited command of the Spanish language when they arrived in Argentina. They had taken night courses in Spanish at the University of Florida in preparation for their departure for Argentina. Dr. Warnick regularly studied Spanish on his bus trips to work. Obviously, he was constantly exposed to Spanish in his work assignments. Mrs. Warnick had to, and became able to converse in Spanish with tradesmen and owners of shops and markets. By the time they left Argentina, Dr. and Mrs. Warnick had improved a great deal in the use of the Spanish language.
Dr. Warnick;s lectures were delivered in English and translated by one of his assigned Argentine veterinarians. He endeavored to give his last lecture in Spanish, but after a few moments, resorted to English at the suggestion of his Argentine associates. The discussions which followed his lectures were in Spanish, and Dr. Warnick came to participate fairly well.
79. In early May 1963, shortly after moving into their second home in Mar del Plata, the Warnicks subscribed to the following newspapers and magazines: The Buenos Aires BEerald, printed in English but containing Argentine news; La Prensa, the major Argentine newspaper, printed in Spanish, containing Argentine and world news; La Nación, printed in Spanish, with its Sunday edition only received by the Warnicks; the Billiken, a monthly magazine, printed in Spanish, containing history, current events, satire and comics; and a monthly church magazine printed in Spanish.
80. In addition to Dr. Wamick’s associations in his FAO assignment, Mrs. Wamick’s shopping activities, the children’s attendance at school, and the participation of the whole Warnick family in church affairs, the Warnicks went on occasions to the beach with Argentine friends, attended local picnics at which they engaged in games with Argentines, dined once or twice a month at local restaurants with Argentine friends, attended local Argentine movies, used the services of an Argentine radio repairman and automobile serviceman, planted a garden, flowers and trees around their second home, and raised chickens there.
*80 81. Dr. Warnick owned an automobile in Florida, which he left with friends there, while he was away on his FAO assignment in Argentina, which he resumed using upon his return. Prior to his departure for Argentina, he ordered and made arrangements to have a new Chevrolet shipped to him in Argentina, received by him in June 1963, and thereafter used for transportation of the Warnick family. Dr. Warnick estimated that American automobiles sold in Argentina for two or three times their American price. The transportation of the Chevrolet from New York to Buenos Aires cost from $500 to $800. Immediately prior to their return to Florida, the Wamicks sold the automobile at a loss to their close friends, who had rented the second home to the Warnicks, and who had been close associates of the Warnicks in church and social activities.
Dr. and Mrs. Warnick each used in Argentina an international driving permit, issued at New York City on December 30,1962, and obviously forwarded to them in Argentina.
82. While in Argentina, the Wamicks received their personal mail at a post office box in Mar del Plata, with occasional mail delivered directly to their home. Dr. Warnick had been told that it was safer and more reliable to have the mail delivered to a post office box.
The Florida home utility bills were mailed directly to the Warnick’s neighbor, entrusted with the care of that home.
83. While in Argentina, Dr. and Mrs. Warnick maintained checking accounts at Gainesville, Florida, the Florida National Bank, and at Mar del Plata, Argentina, the Banco de Londres y America del Sud. About 50 percent of Dr. War-nick’s FAO salary was deposited in the Argentine bank, and the rest in the Florida bank.
84. Dr. Warnick was a registered voter in Florida, but did not vote during his 'absence in Argentina, nor did he participate in any Argentine election, if in fact one was held while he was there.
While in Argentina, Dr. Warnick applied for and was granted an Argentine resident identification card.
*81 85. During 1963, Dr. and Mrs. Warnick were listed in the Gainesville city directory, the deadline for listing in which must have been prior to July 1,1962, when he became a full professor, as the directory listed him as an associate professor, and gave the address of his Florida home.
Dr. Warnick was listed in the December 1962 Gainesville telephone directory, but not in the December 1963 edition, in which Dr. Wamick’s tenant was listed with a telephone number at the address of the Warnick home. The deadline for listing in such directories is not shown in evidence.
86. Prior to his departure from Florida for Argentina, Dr. Warnick was an active member of various American professional societies, and he maintained his memberships while in Argentina. He did not join any club or association in Argentina. There is no evidence as to whether or not Dr. Warnick changed any of h'is address listings with any of the American societies.
87. By letter to Dr. Warnick, dated May 10,1963, FAO’s director of its Division of Finance acknowledged receipt from Dr. Warnick of income tax documentation to be forwarded to the Internal Bevenue Service, and stated that while his entry-on-duty date with FAO was December 29, 1962, he had received no FAO salary until 1963, that his tax return for 1963 was not due until April 15, 1964, and that there was no need to request an extension of time for filing the tax return for 1963. The letter further stated:
❖ * * * *
I understand from your Division that you are on leave from the University of Florida for a period of one year only, and that you will not be available to accept an extension of this appointment even though the post you occupy is included in the Program Budget for 1964.
However, if you are to qualify for income tax exemption on your FAO earnings under the provisions of Section 911 of the U.S. Internal Bevenue Code, as a bona fide resident in a foreign country for an uninterrupted' period which includes an entire taxable year, this would mean that your employment and residence abroad continue for the entire taxable year, i.e. 1 Jan *82 uary 1963 to and including 31 December 1963, in which case you would not be returning to the U.S. before 1 January 1964, or later.
I have advised your Division on this matter in order that the necessary administrative arrangements may be made for the extension of your appointment through December 1963, which will enable you to take advantage of the tax exemption provisions.
88. By letter to Dr. Warnick, dated September 26, 1963, the head of Dr. Warnick’s department at the University of Florida advised that while in Rome, he had talked to an FAO official regarding Dr. Warnick’s reporting back to the university a few days after January 1, and stated that it would be all right with the university. Dr. Warnick was requested to provide any suggestions he might have with respect to physiology courses in the combined curriculum being formed at the university for Animal Science, Dairy Science, and Poultry Science.
89. FAO was anxious to have Dr. Warnick continue his services for an additional year, and Dr. Warnick ivas willing. While in Argentina, he wrote to his university department head and requested an additional leave of absence for one year for the purpose. The university declined. There had to be a replacement for Dr. Warnick in both his teaching and research, and the university required his services.
While enroute from Rome, Italy, to Argentina in 1963, an FAO official stopped at the University of Florida, and unsuccessfully attempted to persuade university officials to grant Dr. Warnick a leave of absence for another year to continue his FAO assignment in Argentina.
90. By letter to Dr. Warnick, dated December 6, 1963, FAO advised in detail concerning administrative and other matters to be accomplished before or immediately following completion of his FAO assignment. Dr. Warnick was reminded of FAO’s letter to him of May 10, 1963, regarding tax exemption of his FAO salary, and it was stated that FAO would extend his appointment to January 3 or 4, if desired by *83 him, but that in any case he should not return to the United States before January 1,1964.
91. By letter to Dr. Warnick, dated December 23, 1963, FAO’s chief of its cattle production section advised that Dr. Warnick’s suggestion that he be returned to the project two or three times during the next 3 years would have to be handled as a consultant arrangement, that clearances would have to be obtained, and that FAO could give him no assurances at that time. Dr. Warnick was complimented for his services in Argentina, and the writer stated that he wished it were possible for Dr. Warnick to continue on the project, but understood that was not possible, after talking to the head of Dr. Warnick’s university department in Borne the preceding September.
92. Dr. Warnick submitted his final formal report to FAO in the latter part of December 1963, but continued performance of services for FAO until the day of his departure from Argentina on January 2,1964.
9.3. Since their return from Argentina, the Warnicks have had considerable correspondence with persons they met and associated with in Argentina. They have had as visitors in their Gainesville, Florida, home the wife and two daughters of the Argentine who rented them their second Mar del Plata home. One of the daughters traveled with the Warnicks in the summer of 1967 from Utah to Florida on a motor trip with camper-trailer. Argentine experiment station workers have called at Dr. Warnick’s Gainesville, Florida, home since his return from Argentina, in connection with training assignments in the United States.
94. While he was in Argentina, a replacement professor carried on Dr. Warnick’s teaching and research assignments at the University of Florida.
Immediately following his return to Gainesville, Florida, on January 3, 1964, Dr. Warnick resumed his teaching and research -work at the University of Florida, and his supervision of graduate students. He occupied the same office which he had prior to his departure for Argentina.

*84
Dr. and Mrs. Wamich and the Internal Revenue Service

95. The following income was received by plaintiffs War-nick in taxable year 1963:

Source Income

Food and Agriculture Organization-$10,322. 22
Rentals and royalties- 1,149. 31
Total _ 11,471.53
96. On March 14, 1964, Dr. and Mrs. Warnick filed their joint federal income tax return for the taxable year 1963 with the District Director of Internal Revenue. The following estimated tax payments were made and tax liability reported for that year:
Estimated tax payments made_$829. 59
Tax liability_ 0
Overpayment (refund claimed)_ 829.59
The refund claimed was paid to the Warnicks in June 1964.
97. For the taxable year 1963, the Warnicks excluded from gross income $10,265.39 of the $10,322.22 of FAO salary received by Dr. Warnick in 1963, on the ground that Dr. Warnick was a bona fide resident of a foreign country for an uninterrupted period which included an entire taxable year as required under § 911(a) (1) of the Internal Revenue Code of 1954.
The $56.83 balance of the FAO salary received in 1963, representing earnings for December 29-30, 1962, received in 1963, was inadvertently included by the Warnicks in gross income. The Warnicks were on the cash receipts and disbursements basis of accounting.
98. By letter dated February 23, 1965, the Director of International Operations, Internal Revenue Service, Washington, D.C., asserted a deficiency of income tax against the Warnicks in the amount of $1,563.73 for the taxable year 1963.
Such deficiency assessment was based upon the statement that Dr. Wamick’s FAO salary was not excludable from gross income under § 911 of the Internal Revenue Code, holding that Dr. Warnick’s stay in Argentina was limited to a *85 definite period as indicated in the provisions of his contract, and that bona fide residence in a foreign country is based on intent to remain in a foreign country for an indefinite period coupled with the establishment of a home there.
99. By notice of July 80, 1965, the Director of International Operations provided the Warnicks with a statement of tax due for 1963, showing the amount due, including $118.82 interest, to be $1,682.55.
The Warnicks made payment of such amount on August 12, 1965.
100. On June 16,1965, there was timely filed on behalf of the Warnicks a claim for refund of income tax for 1963, asserting the same grounds for recovery as are alleged in their petition timely filed herein. An amended claim was filed September 9, 1965. These claims were disallowed in full by the Director of International Operations by letter dated February 11, 1966.
Ultimate FINDINGS of Fact
101. Neither Dr. Scott nor Dr. Wamick had the intent to remain in Argentina permanently or indefinitely.
102. Neither Dr. Scott nor Dr. Wamick was a mere transient, traveler, visitor, or sojourner during their respective stays in Argentina.
103. Both Dr. Scott and Dr. Wamick were bona fide residents of Argentina, each for an uninterrupted period which included an entire taxable year, during which each received income from sources without the United States.
CONCLUSION OF LAW
Upon the foregoing findings of fact the court concludes, as a matter of law, that plaintiffs are entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined in accordance with Buie 131 (c).
In accordance with the opinion of the court, a stipulation of the parties and a memorandum report of the commissioner *86 as to the amount due thereunder, it was ordered on January 5, 1971 that judgment for plaintiffs be entered as follows:
Scott, Jr-$4; 514. 01
Warnicketux_ 1,682.55 together with interest as provided by law.

 Since plaintiff Barbara W. Warnick is a party only because she filed a joint tax return with her husband, the word “plaintiff” refers only to her husband, unless the context plainly indicates otherwise.